[Civ. No. 45288. First Dist., Div. Two. June 18, 1981.]

ALIOTO'S FISH COMPANY, LTD., et al., Plaintiffs and Respondents, v.
HUMAN RIGHTS COMMISSION OF SAN FRANCISCO et al., Defendants and Appellants.

**COUNSEL**

George Agnost, City Attorney, and Judith L. Teichman, Deputy City Attorney, for Defendants and Appellants.

George Deukmejian, Attorney General, Marian M. Johnston, Deputy Attorney General, Jeffery J. Parish, Rosenblum, Fenolio, Parish, Jack & Bacigalupi, Samuel B. Casey and Chickering & Gregory as Amici Curiae on behalf of Defendants and Appellants.

James C. Purcell, Reginald R. Armando and Allan Yannow for Plaintiffs and Respondents.

OPINION

SMITH, J.—Respondents, a group of 14 Fisherman's Wharf restaurants[1] (hereinafter the Restaurants), instituted this action for writ of mandate and declaratory and injunctive relief against appellants San Francisco Human Rights Commission (hereinafter HRC), San Francisco Port Commission (hereinafter the Port Commission) and their respective commissioners, directors and employees (collectively, the City). The Restaurants sought, inter alia, 1) a peremptory writ ordering the HRC to refrain from enforcing a provision contained in their leases of land from the Port Commission which expressly incorporates into each lease agreement the employment nondiscrimination provisions of chapter 12B of the San Francisco Administrative Code, 2) a declaration that they are not required to enter into an affirmative action agreement proposed by the HRC or to answer an HRC questionnaire regarding their recruitment, hiring and training practices, 3) a declaration that chapter 12B does not apply to those restaurants which signed their leases before chapter 12B was amended specifically to include leases, and 4) an injunction restraining the City from requiring them to enter into the proposed affirmative action agreement or to answer the questionnaire. The Restaurants alleged that chapter 12B is preempted by the former Fair Employment Practices Act (former Lab. Code, § 1410 et seq., hereinafter FEPA).[2] In addition, they asserted that the City was attempting to coerce them into entering into an affirmative action agreement which compelled them to practice "reverse discrimination" in violation of equal protection guarantees and title VII of the Civil Rights Act.

In this appeal from a judgment which afforded the Restaurants the declaratory and injunctive relief sought, the City challenges the trial court's rulings that: 1) because the FEPA preempted the field of employment discrimination, local governments might not insert and enforce nondiscrimination and affirmative action provisions in their leases of public property; 2) chapter 12B does not apply to leases; 3) the proposed affirmative action agreement violates the equal protection

---

[1]The 14 restaurants are: Alioto's Fish Company Ltd., Borruso's Lighthouse Seafood Grotto, Castagnola's Restaurant, Fisherman's Grotto, The Franciscan Restaurant, Scoma's Restaurant, Tarantino's Restaurant, Victoria Station, Bundox Restaurant dba The Waterfront, Sinbad's Pier #2 Restaurant, Franceschi's Restaurant, Carnation Co., Inc., Pompei's Grotto, and Sabella's & La Torre Restaurant.

[2]The Fair Employment Practices Act was repealed in 1980. (Stats. 1980, ch. 992, § 11.) Many of its provisions are now codified in the Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.)

guarantees of the federal and state Constitutions and title VII of the Civil Rights Act; and 4) the Restaurants might properly refuse to answer the HRC questionnaire.

For the reasons discussed below, we have concluded that the judgment must be reversed.

## I. *Factual and procedural background*

The contractual provision in issue in this case expressly incorporates into each restaurant's lease from the Port Commission the employment nondiscrimination provisions of chapter 12B section 12B.2 of the San Francisco Administrative Code.[3] Although the leased property is subject to the jurisdiction of the Port Commission, the HRC is responsible for enforcing the employment nondiscrimination provisions of the leases.

In pertinent part, section 12B.2, subdivision (a) currently provides as follows: "Wherever the work is performed or supplies are manufactured in the United States, the contractor, subcontractor or supplier will not discriminate against any employee or applicant for employment because of race, color, religion, ancestry, national origin, age, sex or sexual orientation. The contractor, subcontractor or supplier will take affirmative action to ensure that applicants are employed, and that employees are treated equally during employment, without regard to their race, color, religion, ancestry, national origin, age, sex, sexual orientation or disability. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship."[4] Al-

---

[3]Under the terms of the lease of Alioto's Fish Company, the only lease contained in the record, the Port Commission leases "real property and improvements ... for a term of sixty-six ... years, commencing on May 1, 1970." That lease provides: "Nondiscrimination provisions attached hereto are made a part hereof. Where the term 'contractor' is used therein it shall be deemed to mean 'tenant.'"

The parties agree that the "nondiscrimination provisions" identified in the lease are chapter 12B section 12B.2 of the San Francisco Administrative Code. The parties further agree that section 12B.4 of chapter 12B is inapplicable to the Restaurants. Section 12B.4 in relevant part provides that "[i]n order to be eligible to bid or to have a bid considered by the awarding agency, the contractor in all public works contracts shall submit an affirmative action program which shall meet the requirements of the human rights commission [sic]."

[4]This section was amended in January 1977 to add "disability"; "sex" and "sexual orientation" were added in April 1972; "age" was added in early 1974. Since the Res-

though, as originally enacted in 1966, chapter 12B did not specifically refer to leases, the ordinance was amended in 1974 specifically to include leases.[5]

From 1970 to 1975, the Port Commission and the Restaurants entered into annual affirmative action agreements. The 1975-1976 version of that agreement provided that the agreement would be in effect for 12 months following the date of execution. By its terms, the HRC, as a contracting party, was charged with enforcement of its provisions.

The agreement required that "all recruiting, hiring, promotional and general employment practices shall be conducted without discrimination on the basis of race, religion, national origin, sex, sexual orientation or age, as per the Nondiscrimination Ordinance (chapter 12B) of the City and County of San Francisco." The agreement set forth specific procedures to be followed to implement the Restaurants' promise to "actively recruit minority and female applicants for all employment." Subject to collective bargaining agreements, the Restaurants agreed to keep the applications of minority and female job applicants in an affirmative action file and to utilize this file to obtain applicants where a vacancy could not be filled by rehiring employees on layoff status, by upgrading existing staff, or by seeking referrals from the appropriate union with emphasis on affirmative action recruitment. The Restaurants further agreed that, if a vacancy could not be filled by resort to such measures, they would notify the HRC's recruitment unit and actively recruit from an attached referral source list. Agreement provisions pertaining to training required the Restaurants to make an effort to review minority and female employees for upgrading and to take certain measures for the training of such persons, with special emphasis in areas where they were underrepresented. Under a heading entitled "Goals," the agreement provided: "Each restaurant will have a goal of 50% minority and 30% women for new hires during this agreement year. . . . Each restaurant will have a minimum goal of one minority and one woman trainee during this agreement year, to be retained upon successful completion of training. This training may include an apprentice from the approved list of bartender or cook apprentices. . . . The goal for promotion during this agreement year will be 60% minority and 40% women. Emphasis in

taurants' leases were not all signed in the same year, the type of discrimination prohibited by a particular lease may vary.

[5] Eight of the Restaurants signed their leases before the 1974 amendment. They are: Alioto's, Borruso's Lighthouse Seafood Grotto, Castagnola's, Fisherman's Grotto, The Franciscan, Sabella's & La Torre's, Victoria Station, and Carnation Company. The remaining Restaurants signed their leases after the amendment in question.

reaching these goals will be given to those groups underrepresented in each individual restaurant and job category."

Under the terms of the agreement, the Restaurants agreed "that a quarterly report, on forms provided by the HRC, shall be submitted which indicates the number of applicants, new hires, terminations, applications placed in Affirmative Action File, promotions, trainees, and total current employees, categorized by race, ethnic group and sex." The Restaurants also agreed "to submit an annual in-depth Employment Survey, on forms provided by the HRC." The agreement provided for review of compliance by the HRC at any time.

In August 1976, the HRC staff prepared a summary of employment data provided by the Restaurants pursuant to the agreement. The summary, which was presented to the HRC, reported that for the years 1973 through 1975 many of the goals in the agreement had not been met.

The agreement proposed by the HRC for the annual period beginning October 15, 1976, was in most respects identical to the 1975-1976 agreement, except that it set hiring goals at 50 percent minorities and 60 percent women and promotion goals at 80 percent minorities and 40 percent women. In addition, it stated: "It is noted that, in accordance with chapter 12B of the San Francisco Administrative Code, each of the undersigned restaurants has, under its lease with the Port of San Francisco, already agreed 'not to discriminate on the ground or because of race, color, creed, national origin, ancestry, age, sex or sexual orientation, against any employee or, or applicant for employment with said' restaurant. It is further noted that said restaurants are adopting an affirmative action agreement voluntarily."

The Restaurants rejected this proposed agreement. Instead, they proposed their own version of an industrywide affirmative action agreement which was rejected by the HRC. The Restaurants have refused to enter into a new affirmative action agreement since that time.

When the Restaurants abandoned efforts to arrive at a 1976-1977 affirmative action agreement acceptable to all parties, the HRC staff asked them to complete a 10-page questionnaire on recruitment, hiring and training practices as a first step in analyzing their current level of compliance with the nondiscrimination requirements of their leases. The

Restaurants refused to answer this questionnaire. Instead, on February 4, 1977, they filed this action for writ of mandate and declaratory and injunctive relief. A subsequent nonjury trial resulted in a judgment in favor of the Restaurants from which the City has appealed.

## II. *Preemption*

The City first contends that the nondiscrimination and affirmative action provisions embodied in chapter 12B of the San Francisco Administrative Code are not preempted by the former FEPA both because the Legislature did not intend to preclude local governments from including nondiscrimination requirements in their contracts and because the terms of such contracts are a municipal affair.

Generally, local governments may legislate upon matters of both local and statewide concern. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 69-70 [81 Cal.Rptr. 465, 460 P.2d 137].) However, under the preemption doctrine, local regulation of matters of statewide concern "remain[s] subject to and controlled by applicable ... state laws ... if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation." (Id. at pp. 61-62; Cal. Const., art. XI, § 7.) This doctrine is based upon the superior authority of the state as well as the need to prevent dual regulations which might result in confusion and uncertainty. (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 682 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].) On the other hand, San Francisco, as a charter city, "may make and enforce all ordinances and regulations in respect to municipal affairs, [which] shall supersede all laws inconsistent therewith." (Cal. Const. art. XI, § 5, subd. (a); see also *Smith* v. *City of Riverside* (1973) 34 Cal.App.3d 529, 534 [110 Cal.Rptr. 67].) "[O]rdinances relating to matters which are purely 'municipal affairs' are not invalid because they are in conflict with general state laws or because state laws have been enacted to cover the same subject." (*Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535, 539 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036]; see also *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 315 [152 Cal.Rptr. 903, 591 P.2d 1].)

However, it is only in the event of conflict between the regulations of state and of local governments, or if the state Legislature discloses an intent to preempt the field that the question becomes one of

predominance or superiority as between general state laws on the one hand and local regulations on the other. (See *Bishop* v. *City of San Jose, supra*, 1 Cal.3d 56, 62.) ▉ Since, for the reasons that follow, we hold that the provisions of chapter 12B are entirely consistent with FEPA, it will not be necessary to address the City's contention that the subject of the ordinance is a municipal affair.

▉ A conflict between local and state regulation may arise where local government attempts to regulate in an area which is fully occupied by general law or where local regulation duplicates or contradicts state law. (*Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681]; *Baron* v. *City of Los Angeles, supra*, 2 Cal.3d 535, 541.) However, where the state's preemption of the field or subject is not complete, local supplemental legislation is not deemed conflicting to the extent that it covers phases of the subject which have not been covered by state law. (*Baron* v. *City of Los Angeles, supra*, at p. 541.)

▉ Certainly, the Legislature evinced an intent to occupy a major portion of the field of employment discrimination with the enactment of former Labor Code section 1432, subdivision (c) which stated: " . . . [I]t is the intention of the legislature to occupy the field of regulation of discrimination in employment encompassed by the provisions of this part, exclusive of all other laws banning discrimination in employment by any city, city and county, county or other political subdivision of the state . . . ." (See also 42 Ops.Cal.Atty.Gen. 114 (1963).)

A careful analysis and comparison of FEPA and the provisions of chapter 12B, however, compels the conclusion that the Legislature did not intend to preclude municipalities from including nondiscrimination provisions in their leases.

The FEPA was a comprehensive police power measure designed to protect individuals from discriminatory employment practices. (See former Lab. Code, § 1411; *Mahdavi* v. *Fair Employment Practice Com.* (1977) 67 Cal.App.3d 326, 333 [136 Cal.Rptr. 421].) It established a complaint mechanism whereby an aggrieved individual or the Attorney General might initiate an investigation by the Fair Employment Practice Commission (hereinafter FEPC) into such practices. (Former Lab. Code, § 1422.) The FEPC was empowered to issue formal accusations

and to hold hearings. (Former Lab. Code, §§ 1423-1424.) Upon a finding that unlawful employment practices had occurred, the FEPC was required to issue a cease and desist order; it might also require the rehiring, reinstatement or upgrading of aggrieved employees. (Former Lab. Code, § 1426, subd. (a); see also 60 Ops.Cal.Atty.Gen. 394, 397 (1977).)

Chapter 12B, on the other hand, is an exercise of the City's contracting power. The ordinance does not ban discrimination in employment but merely prescribes certain provisions in City contracts. Those who find such provisions burdensome may simply refuse to contract. While the ordinance provides an investigation and hearing procedure similar to that of FEPA (see San Francisco Admin. Code, § 12B.2, subds. (e) and (f)), its remedies inure primarily to the City's benefit and only indirectly to the benefit of employees. Thus, section 12B.2, subdivision (g) provides for a penalty of $50 per day for each person against whom the contractor has discriminated, to be deducted from the amount otherwise payable to the contractor. Since a breach of nondiscrimination provisions of the contract is deemed material, the City may cancel the contract; it may also bar the contractor from bidding on City contracts for up to two years. (§ 12B.2, subds. (g) and (h).)

In several opinions, the Attorney General has recognized that a local agency's insertion of nondiscrimination provisions in its contracts is an exercise of its contracting power which falls outside the scope of the police power measures embodied in FEPA. (42 Ops.Cal.Atty.Gen. 169 (1963); 44 Ops.Cal.Atty.Gen. 65, 67 (1964); see also 42 Ops.Cal. Atty.Gen. 114 (1963); 60 Ops.Cal.Atty.Gen. 394, 397 (1977).) In explaining the basis for his decision that the Berkeley Board of Education might properly include clauses prohibiting discrimination in employment in its construction contracts, the Attorney General observed that such clauses "would be intended and designed to protect the school district from entering into a contract for or expending funds on a project executed in a manner contrary to the laws of the state. Such clauses constitute examples of the exercise by the local entity of its contracting power, a determination of the nature of the contractual obligations it may desire to enter into and a requirement which provides a remedy not for the injured employee, but, instead, a remedy to the public agency for the special injury it suffers." (44 Ops.Cal.Atty.Gen. 65, 67 (1964); see also 60 Ops.Cal.Atty.Gen. 394, 397 (1977).)

Amendments to FEPA subsequent to the Attorney General's opinions gave explicit recognition to the involvement of local human relations committees such as the HRC in the field of employment discrimination. In 1978, former Labor Code section 1431 was repealed and reenacted to read in relevant part as follows: "Where the division [of Fair Employment Practice] or a federal compliance agency has required the preparation of an affirmative action, equal employment, or nondiscrimination program subject to review and approval by the division or a federal compliance agency, evidence of such a program shall also constitute prima facie compliance with an ordinance or regulation of any city ... which requires an employer to submit such a program to a local awarding agency for its approval prior to becoming a contractor or subcontractor with such agency." (See also former Lab. Code, § 1420.5.) Being entirely consonant with the Attorney General's interpretation of FEPA, this provision was evidence of legislative intent to adopt such an interpretation. (See *Wallace v. Department of Motor Vehicles* (1970) 12 Cal.App.3d 356, 362-363 [90 Cal.Rptr. 657]; *Smith v. Municipal Court* (1959) 167 Cal.App.2d 534, 539 [334 P.2d 931].)

Our conclusion that chapter 12B is supplemental to and outside the scope of FEPA finds further support in the existence of state and federal laws which require contractors to agree to nondiscrimination contractual provisions. Thus, it has been held that Executive Order No. 11246, 3 Code of Federal Regulations, section 339 (1965) which requires federal contractors to agree to such provisions is not preempted by title VII of the Civil Rights Act of 1964 which provides a remedy for victims of employment discrimination. (*Contractors Ass'n of Eastern Pa. v. Secretary of Labor* (3d Cir. 1971) 442 F.2d 159, 170-171, cert. den., 404 U.S. 854 [30 L.Ed.2d 95, 92 S.Ct. 98].) Similarly, FEPA was supplemented by legislation and regulations pertaining to nondiscrimination in state contracts. (See Gov. Code, §§ 11135-11139.5; Governor's Code of Fair Practices, art. IV.) The coexistence of such provisions makes it apparent that both our state and federal Legislatures have concluded that nondiscrimination provisions in contracts do not in any meaningful way interfere with the administration of general laws prohibiting discrimination in employment.

Based upon the foregoing analysis, we conclude that the trial court erred in ruling that FEPA occupied the field of employment discrimination so as to preclude the City from inserting nondiscrimination and affirmative action provisions in its leases with the Restaurants.

III. *The 1974 amendment to chapter 12B*

■ The City's next assignment of error questions the trial court's ruling that the Restaurants' leases fall outside the scope of chapter 12B's coverage.

Since the ordinance was amended in 1974 specifically to include leases, the trial court's ruling is clearly erroneous as to the six restaurants which signed their leases after the 1974 amendment.

We view the City's right to prevail against the remaining eight restaurants which signed their leases prior to the enactment of this amendment as dependent upon the existence of authorization for the Port Commission's insertion of the nondiscrimination provision in the leases of those restaurants.

Each of these restaurants' leases states that "[n]ondiscrimination provisions attached hereto are made a part hereof. Where the term 'contractor' is used it shall be deemed to mean 'tenant.'" The parties are in agreement that this provision refers to the nondiscrimination provisions embodied in chapter 12B section 12B.2.

The Port Commission's powers under the City Charter include "the control and management of all real and personal property ... placed under its management, supervision and control.... The Port Commission shall have the power to use, conduct, operate, maintain, manage, regulate, and control the port area of San Francisco and to do all things it deems necessary in connection with the use, conduct, operation, management, maintenance, regulation, improvement and control of said port area, or which may further the interests of the port in world trade, including, without limiting the generality of the foregoing, the exclusive power to perform or accomplish the following: .... (6) The grant of ... the lease of said lands, facilities or any part hereof for limited periods not exceeding 66 years ... (12) To enter into contracts, agreements, or stipulations germane to the scope of its powers and duties." (Charter of the City & County of S. F., art. I, § 3.581.)

Under the broad language of this section, there can be little doubt that the insertion of nondiscrimination provisions in port leases constitutes an excercise of the Port Commission's power and duty to "regulate and control the port area" and to "further the interests of the port in

world trade." We therefore need not reach the issue whether chapter 12B applied to leases prior to its 1974 amendment.

IV. *The proposed affirmative action agreement*

The City next challenges the trial court's declaration that "[the] Human Rights Commission of San Francisco and the San Francisco Port Commission, their servants, agents and employees, by requiring that [the Restaurants] enter into an Affirmative Action Agreement in the form and content prescribed by the Human Rights Commission of San Francisco are attempting to impose racial quotas on [the Restaurants]" in violation of the federal and state Constitutions and title VII of the Civil Rights Act of 1964. The City contends that no substantial evidence was adduced at trial to support the court's finding that the Restaurants were being required to enter into a new affirmative action agreement.

In passing upon the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prevailing party. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238.) Substantial evidence, however, is not *any* evidence. To support the judgment, the evidence must be reasonable in nature, credible and of solid value. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; 6 Witkin, *supra*, § 252-253, pp. 4243-4245.)

Here, there was no evidence that the City was attempting to impose an affirmative action agreement upon the Restaurants. The only testimony presented on this issue was based upon several letters sent by the Human Rights Commission to the Restaurants. In these letters, which either accompanied a proposed affirmative action agreement or requested the Restaurants to answer a questionnaire regarding their employment practices, the HRC did not seek to impose its proposed agreement upon the Restaurants, but merely expressed a desire to enter into a new agreement through negotiation. The record is devoid of any evidence that the City intended to compel the Restaurants to enter into a new agreement in the event of their refusal to proceed with negotiations in good faith. On the contrary, uncontradicted evidence was presented that, if the Restaurants' responses to the questionnaire revealed compliance with chapter 12B, section 12B.2, the City would release the Restaurants from any contractual or statutory obligation

they may have had to enter into an agreement for the coming year. Indeed, the City has taken the position throughout these proceedings that section 12B.2 does not require the Restaurants to enter into an affirmative action agreement and that voluntary adoption of such an agreement was merely one of several ways in which the Restaurant might produce evidence of compliance with the nondiscrimination requirements of section 12B.2.

## V. *The questionnaire*

Lastly, the City questions the trial court's ruling that the Restaurants are not required to answer the HRC questionnaire inquiring into their recruitment, hiring and training practices as they relate to minority persons and women.

The judgment prohibiting the City from requiring that the Restaurants answer this questionnaire was based upon the finding that the HRC was using the questionnaire to coerce the Restaurants into entering into an affirmative action agreement which required hiring and promotional practices according to illegal racial quotas.

Provisions of chapter 12B, which are binding upon the Restaurants pursuant to the terms of their leases, clearly authorize the City to compel disclosure of the information sought. Section 12B.2, subdivisions (e) and (k) respectively require that a contractor must "on request provide evidence that he/she has or will comply with the nondiscrimination provisions of [his] contract" and will file with the Human Rights Commission ". . . a basic compliance report, which may be a copy of the Federal EEO-1, or a more detailed report as determined by the [HRC]."

In *United States* v. *State of N.H.* (1st Cir. 1976) 539 F.2d 277, cert. den. (1976) 429 U.S. 1023 [50 L.Ed.2d 625, 97 S.Ct. 641], the United States brought suit to compel New Hampshire to file acceptable reports concerning the race, national origin and sex of employees as required by title VII of the Civil Rights Act of 1964 and regulations promulgated thereunder. The court of appeals held that the regulations requiring disclosure of such information were reasonable and consistent with title VII. In rejecting the argument that the reporting requirement could not be upheld because the report might be misused to impose illegal hiring quotas, the court stated: "[P]ossible and purely hypothetical misuse of data does not require the banning of reasonable procedures to acquire

such data. Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted. And any positive steps which the United States might subsequently take as a result of its interpretation of the data in question remain subject to law and judicial scrutiny." (*Id.* at p. 280.)

Here, the procedure for gathering employment statistics was reasonable and agreed to by the Restaurants under the terms of their leases. The record is totally devoid of any evidence that the City intended to use the information in any manner prohibited by law but merely shows that the information was being sought to evaluate the Restaurants' compliance with the nondiscrimination provisions of their leases. Under these circumstances, the court's ruling on this issue cannot stand.

The judgment is reversed.

Taylor, P. J., and Rouse, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 12, 1981.