[No. B168209. Second Dist., Div. Four. Oct. 19, 2004.]

BURNS INTERNATIONAL SECURITY SERVICES CORPORATION,
Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

COUNSEL

Musick, Peeler & Garrett, Gary F. Overstreet and William J. Tebbe for Plaintiff and Appellant.

Lloyd W. Pellman, County Counsel, Larry Cory, Assistant County Counsel, David Michaelson, Principal Deputy County Counsel, Robert C. Cartwright and Jerry M. Custis, Deputy County Counsel, for Defendants and Respondents.

OPINION

**CURRY, J.**—Appellant Burns International Security Services Corporation (Burns) seeks to prevent respondent County of Los Angeles (the County) from enforcing Los Angeles County Code chapter 2.203 (Chapter 2.203), which essentially precludes the County from contracting with companies that do not pay their employees for at least five days of jury duty. Burns contends (1) that Chapter 2.203 violates article 11, section 7 of the California Constitution (article 11, section 7), which prohibits local entities from enforcing regulations extraterritorially, and (2) that Chapter 2.203 is preempted by state law. The trial court rejected those contentions based on *Alioto's Fish Co. v. Human Rights Com. of San Francisco* (1981) 120 Cal.App.3d 594 [174 Cal.Rptr. 763] (*Alioto's*), in which the court held that a local ordinance that pertains solely to the terms to be included in government contracts is not a regulation and not subject to preemption. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Ordinance and the Complaint*

On January 27, 2003, Burns filed suit against the County for declaratory and injunctive relief to prevent the County from enforcing Chapter 2.203, enacted February 26, 2002. Chapter 2.203, section 2.203.010 provides in relevant part that "many businesses do not offer or are reducing or even eliminating compensation to employees who serve on juries" creating "a potential financial hardship for employees who do not receive their pay when called to jury service," reducing "the number of potential jurors," and increasing "the burden on those employers, such as [the County], who pay their permanent, full-time employees while on juror duty."

For the stated reasons, the ordinance requires "contractors who enter into contracts that commence after July 11, 2002" and "contractors with existing contracts which are extended into option years that commence after July 11,

2002" (Ch. 2.203, § 2.203.030) to "have and adhere to a written policy that provides that its employees shall receive from the contractor, on an annual basis, no less than five days of regular pay for actual jury service"[1] (Ch. 2.203, § 2.203.040) and to "certify to the [C]ounty that it has and adheres to a policy consistent with this chapter or will have and adhere to such a policy prior to award of the contract." If a contractor violates such provision, the County department head responsible for administering the contract may either "[r]ecommend to the board of supervisors the termination of the contract" or "seek the debarment of the contractor." (Ch. 2.203, § 2.203.060.)

The following facts were pled in the complaint. Burns is a large provider of security services throughout the United States, and provides security services within California and within the County. In February 2000, Burns successfully bid on, and was awarded, two contracts with the County to provide security services to certain Los Angeles County Department of Public Works (DPW) facilities. The contracts were set to expire on February 1, 2003.

In October 2002, Burns submitted a new proposal to the County to continue providing security services to the DPW facilities. The County advised Burns that its proposal would not be considered because it failed to comply with Chapter 2.203. Burns's proposal certified that it would only "provide at least five days of paid jury duty leave to all full-time employees assigned to perform any services on the DPW contract." Burns asserted that "[t]he County's determination of non-compliance was based upon the failure of Burns to have in place a policy whereby it would agree to provide at least five days of paid jury duty leave to all of its full-time employees who were California residents regardless of whether they resided within the County and regardless of whether they would be providing any services under either of the DPW contracts."

Burns asked that its proposal be reconsidered and requested a "special circumstances" waiver. The County refused. In January 2003, Burns learned that another company had been awarded the contracts.

*Order to Show Cause Re: Preliminary Injunction*

Along with its complaint, Burns filed an application for a temporary restraining order, seeking to preclude the County from enforcing, applying, or requiring adherence to Chapter 2.203, allowing Burns's contracts to expire, entering into DPW security services contracts with anyone else, or prohibiting Burns from engaging in the competitive bidding process for any other

---

[1] "Employee" is limited to "any California resident who is a full-time employee of a contractor under the laws of California." (Ch. 2.203, § 2.203.020.)

contracts. In connection with the application, Burns estimated that it would cost as much as $1 million to provide paid jury duty leave to all of its employees who reside in California.

The court denied the request for a temporary restraining order, but set the matter for an order to show cause re: preliminary injunction. After further briefing, the court denied the application. In its order, the court summarized Burns's contentions as follows: "It contends that the ordinance is invalid for two reasons: It is preempt[ed] by state laws that fully occupy the field; and (2) it purports to exercise legislative power outside the boundaries of the [C]ounty by requiring [Burns] to pay its employees throughout the state while they are on jury duty." The court concluded that neither contention had merit because: "It is clear that the [County] has not attempted to require statewide uniformity with respect to whether employers must pay their employe[es] while they are on jury duty" and because "[t]he [C]ounty ordinance does not have extra-territorial effect because it imposes requirements only upon those who seek to contract with the [C]ounty" and is therefore "indistinguishable from the ordinance that [was upheld in *Alioto's, supra,* 120 Cal.App.3d 594]."

### *The Demurrer*

The County demurred to the complaint. The court concluded that the complaint contained just one cause of action "for declaratory relief as to the validity of [Chapter 2.203] on its face and as applied." Incorporating by reference the reasoning of the prior order, the court ruled that the ordinance was not invalid even if interpreted to require contracting parties to provide at least five days of paid jury duty leave to all of its employees who reside in California regardless of whether the employees would be providing service under any County contract. An order of dismissal was entered, and this appeal followed.

## DISCUSSION

### B

### Extraterritoriality

#### A

Burns contends that because Chapter 2.203 requires contractors to give paid jury services leave to "employees," without distinguishing between employees located inside Los Angeles County and those located outside, it

violates article 11, section 7, which provides: "A county or city may make and enforce within its limits all local police, sanitary, and other ordinances and regulations not in conflict with general laws."

■ It is clear from its language and from the cases interpreting it that article 11, section 7, applies only where the local authority exercises its regulatory or police power as opposed to its contracting power. (See, e.g., *City of Oakland v. Brock* (1937) 8 Cal.2d 639, 641 [67 P.2d 344] ["A municipal corporation has generally no extraterritorial powers of *regulation*" (italics added)]; *Stanislaus Co. etc. Assn. v. Stanislaus* (1937) 8 Cal.2d 378, 383–384 [65 P.2d 1305] ["The authority to enact *police ordinances* for sanitation or health on the part of counties as well as chartered cities is just as broad, sweeping and inclusive as the powers with relation thereto which are vested in the legislature itself, except that they must not conflict with the Constitution or with general laws, and must be confined in their application only to the city or county adopting them" (italics added)]; *City of South San Francisco v. Berry* (1953) 120 Cal.App.2d 252, 253 [260 P.2d 1045] ["The *police power* has been given the county and the city respectively, for exercise only 'within its limits' " (italics added)]; *Miller v. Fowle* (1949) 92 Cal.App.2d 409, 411 [206 P.2d 1106] [" 'A municipal corporation has generally no extraterritorial powers of *regulation*' " (italics added)]; 74 Ops.Cal.Atty.Gen. 211 (1991) ["[T]he rule presently enunciated by the courts is that the *police powers* of cities and counties granted under the Constitution do not extend beyond their territorial limits" (italics added)].) The issue, therefore, is whether a local governmental entity is exercising its regulatory power or contracting power when it enacts an ordinance specifying that only companies that have a policy requiring a specified period of paid jury service for employees who are residents of California will be permitted to enter into contracts with the entity.

This question was resolved in *Alioto's, supra,* 120 Cal.App.3d 594. The provision at issue there required that the City and County of San Francisco employment nondiscrimination ordinance be incorporated into all leases involving city land. The nondiscrimination ordinance stated in part: " 'Wherever the work is performed or supplies are manufactured in the United States, the contractor, subcontractor or supplier will not discriminate against any employee or applicant for employment because of race, color, religion, ancestry, national origin, age, sex or sexual orientation. The contractor, subcontractor or supplier will take affirmative action to ensure that applicants are employed, and that employees are treated equally during employment, without regard to their race, color, religion, ancestry, national origin, age, sex, sexual orientation or disability.' " (*Id.* at p. 600.)

Lessees and prospective lessees brought suit, contending that the provision was preempted by the former Fair Employment Practices Act (former Lab.

Code, § 1410 et seq.). Former Labor Code section 1432, subdivision (c), specifically provided: " '[I]t is the intention of the legislature to occupy the field of regulation of discrimination in employment encompassed by the provisions of this part, exclusive of all other laws banning discrimination in employment by any city, city and county, county or other political subdivision of the state . . . .' " (Quoted in *Alioto's, supra,* 120 Cal.App.3d at p. 604.) Nevertheless, the court rejected the preemption argument because the ordinance at issue was *"an exercise of the City's contracting power." (Id.* at p. 605, italics added.) The court explained why, in its estimation, the ordinance did not represent an exercise of police or regulatory power: "[It] does not ban discrimination in employment but merely prescribes certain provisions in City contracts. Those who find such provisions burdensome may simply refuse to contract. While the ordinance provides an investigation and hearing procedure . . . , its remedies inure primarily to the City's benefit and only indirectly to the benefit of employees. Thus, [the ordinance] provides for a penalty of $50 per day for each person against whom the contractor has discriminated, to be deducted from the amount otherwise payable to the contractor. Since a breach of nondiscrimination provisions of the contract is deemed material, the City may cancel the contract; it may also bar the contractor from bidding on City contracts for up to two years. [Citation.]" *(Ibid.)*

The court in *Alioto's* relied in part on an Attorney General opinion discussing a similar antidiscrimination clause enacted by a different local entity: "In explaining the basis for his decision that the Berkeley Board of Education might properly include clauses prohibiting discrimination in employment in its construction contracts, the Attorney General observed that such clauses 'would be intended and designed to protect the school district from entering into a contract for or expending funds on a project executed in a manner contrary to the laws of the state. Such clauses constitute examples of the exercise by the local entity of its contracting power, a determination of the nature of the contractual obligations it may desire to enter into and a requirement which provides a remedy not for the injured employee, but, instead, a remedy to the public agency for the special injury it suffers.' " *(Alioto's, supra,* 120 Cal.App.3d at p. 605, quoting 44 Ops.Cal.Atty.Gen. 65, 67 (1964).)

Burns contends that the issue of extraterritoriality raised here was not addressed in *Alioto's* "because the challenged ordinance was confined solely to leases involving city property." This is true, but misses the larger point. The court's holding in *Alioto's* turned on whether the ordinance represented an exercise of the City's contracting power or its regulatory power. Because the ordinance "merely prescribe[d] certain provisions in City contracts" and its remedies were contractual in nature and "inure[d] primarily to the City's benefit," the court concluded it was an exercise of contracting power.

(*Alioto's, supra,* 120 Cal.App.3d at pp. 596, 605.) From the premise that the ordinance was not a regulation, the conclusion that it was not preempted followed despite express language in the former Labor Code provision that the Legislature intended " 'to occupy the field of regulation of discrimination in employment.' " (*Id.* at p. 604.) Based on the same premise, such an ordinance is not invalidated by article 11, section 7.

Although we find no state court decision following *Alioto's* on this point,[2] two federal courts have adopted its reasoning in holding that article 11, section 7 does not apply to ordinances that favor bidders based on their superior employee benefit programs or their agreement to provide enhanced employee benefits to all employees wherever located. In *Air Transport Association of America v. City and County of San Francisco* (N.D.Cal. 1998) 992 F.Supp. 1149 (*Air Transport*), the ordinance at issue applied to the San Francisco International Airport and barred contracts with companies whose employee benefit plans discriminated between employees' spouses and employees' domestic partners. Plaintiffs, a group of air trade associations and airlines, argued that "the City lacked the power under the California Constitution to enact the Ordinance because the Ordinance is impermissibly extraterritorial." (*Id.* at p. 1159.) The court reasoned as follows in concluding the statute was not invalid under the California Constitution: "Because the Ordinance reaches beyond the boundaries of San Francisco only by placing conditions on who may enter into Airport-related contracts with the City, it falls within the City's proprietary powers. Although Plaintiffs clearly anticipate that the Ordinance will have extraterritorial effects, for example, by inducing an airline to offer domestic partner benefits nationwide, these possible effects do not establish that the City has acted beyond its powers under the California Constitution." (*Ibid.*)

---

[2] The County cites *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853 [118 Cal.Rptr.2d 746, 44 P.3d 120]. That case is distinguishable because the issue was whether the County could enforce an ordinance banning gun shows and the sale of guns from taking place on property owned by the County, but located in the City of Pomona. Without discussing whether the act was an exercise of regulatory or contract power, the court concluded that the ordinance was valid because "Government Code section 23004, subdivision (d), authorizes the county to manage its own property, and that includes deciding how the property may be used, whether that decision is embodied in a contract with a private party, in an ordinance, or in some combination of the two." (*Id.* at p. 871.)

In *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740 [118 Cal.Rptr.2d 629], also cited by the County, the court quoted with approval the following statement from *SSC Corp. v. Town of Smithtown* (2d Cir. 1995) 66 F.3d 502, 510: " 'To the extent that a state is acting as a market participant, it may pick and choose its business partners, its terms of doing business, and its business goals—just as if it were a private party.' " The court went on to hold, however, that the action in question was "a traditional state regulatory responsibility." (97 Cal.App.4th at p. 768.)

Similarly, in *S.D. Myers, Inc. v. City and County of San Francisco* (9th Cir. 2001) 253 F.3d 461, the court addressed whether a similar ordinance barring discrimination against domestic partners was "invalid under the California constitution because the Ordinance has the effect of regulating outside the geographic boundaries of the City." (*Id.* at p. 473.) The plaintiff there argued that *Alioto's* should not apply "because the Ordinance requires not only nondiscrimination but the affirmation of a particular lifestyle." (*Id.* at p. 474.) The Ninth Circuit characterized the plaintiff's position as an attack on "the mode of contracting rather than the subject matter of any particular contract." (*Ibid.*) In other words, "[plaintiff] is not arguing that the City exercised extraterritorial control in seeking bids on a service contract for the City electrical transformers (subject matter); instead, [plaintiff] contests the City's refusal to contract with those who fail to comply with the Ordinance (mode of contracting)." (*Ibid.*) The court held that "the City's chosen mode of contracting is a municipal affair over which the City may exercise its authority without violating the California constitution" and that "under California law, the Ordinance is an exercise of the City's contracting power." (*Ibid.*) Accordingly, "the City is not acting extraterritorially when it uses that power in conjunction with its proprietary power over City property." (*Ibid.*)

Burns cites *City of Arcata v. Green* (1909) 156 Cal. 759 [106 P. 86] as contrary authority. There, the City of Arcata had granted to defendants by ordinance the right to construct an electric railroad within its boundaries. The grant was made under certain conditions, including " 'that the work of constructing and fully equipping an electric railroad between the city of Eureka and the city of Arcata in said county of Humboldt, shall be commenced within nine months after the passage of this ordinance and the same completed and in operation between said Eureka and Arcata and through Arcata, within two years after the passage of this ordinance' " and that defendants would execute and deliver to Arcata an undertaking or bond in the amount of $5,000, conditioned on completion of both railroads. (*Id.* at p. 760.) Defendants accepted and delivered the undertaking, but no railroad was constructed, inside or outside Arcata. Arcata sued for breach of contract, and asked for liquidated damages in the amount of the bond.

The court in *City of Arcata* concluded that the contract was invalid, and Burns states in its brief that this was because "the condition of requiring defendants to extend the railroad from Arcata to Eureka, was 'clearly extraterritorial.' " This represents an oversimplification of the court's analysis. First, the court discussed the applicability of a statute enacted in 1901, which required "that certain franchises and privileges shall be granted only to the highest bidder, after advertising for bids." (*City of Arcata, supra,* 156 Cal. at p. 761.) There was "no advertisement, nor was there any bid for the

privilege . . . granted to [defendants]" which made it likely that "the ordinance granting it was void, and conferred no rights whatever upon the grantees" and meant that "the bond would clearly be without consideration, and no recovery could be had thereon." (*Id.* at p. 762.) Arcata contended that it had the power to grant the franchise under the former Municipal Corporation Act, which gave to certain cities the power " 'to permit under such restrictions as they may deem proper, the laying of railroad tracks and the running of cars drawn by horses, steam or other power thereon.' " (*Ibid.*, quoting Stats. 1903, p. 93.) Assuming that to be the relevant provision, the court pointed out that the power to grant franchises and impose conditions under the Municipal Corporation Act had previously been held to be " 'legislative in its nature; . . . and . . . not referable for its support to the power of making contracts.' [Citation.]" (156 Cal. at p. 763, quoting *South Pasadena v. Terminal Ry. Co.* (1895) 109 Cal. 315, 320 [41 P. 1093].) The court further noted that "[w]hat the municipality was seeking to bargain for was a road connecting the two cities. The right to run over the streets of Arcata was a mere incident to this scheme, as is strongly indicated by section 12 of the ordinance, which declares that it was not intended to grant a franchise for a street railroad in Arcata." (*City of Arcata*, at p. 764.) In other words, under the guise of granting a franchise for operating a railroad within its boundaries, Arcata was seeking to have defendants build and operate a railroad in an unincorporated area in which it had no jurisdiction. In addition, the statute under which it purported to act had been held to govern the exercise of legislative power. Indeed, as the court pointed out, Arcata had ignored the laws governing its contracting power, and awarded the franchise without advertisement or competitive bidding.

The situation before us is not governed by *City of Arcata.* There is no evidence that the County is attempting to enlarge its powers or regulate outside its boundaries under the guise of seeking bids for security services. It is simply specifying the type of employer with which it wishes to do business. The remedies available under Chapter 2.203 where a contractor fails to certify or certifies falsely as to its provision of jury benefits are purely contractual: possible "termination of the contract" or "debarment of the contractor." In addition, the remedies have effect only within the territorial boundaries. The ordinance does not purport to give power either through police action or civil lawsuit to force contractors to change their behavior outside the County. For these reasons, *Alioto's* represents the relevant precedent.

*B*

■ Although it raises no contention under the United States Constitution, in its reply brief, Burns suggests that recent federal cases analyzing extraterritoriality under the dormant commerce clause[3] undermine the holding in *Alioto's*. Like article 11, section 7, the dormant commerce clause prevents states from improperly restricting commerce outside their boundaries. (See, e.g., *Healy v. Beer Institute* (1989) 491 U.S. 324, 336 [105 L.Ed. 2d 275, 109 S.Ct. 2491].) In determining whether a state enactment that potentially impacts interstate commerce is unconstitutionally extraterritorial, federal courts consider whether the state is acting as a "market participant" or "market regulator"—concepts that are similar to the regulatory power/contracting power distinction drawn in *Alioto's*. (See, e.g., *South-Central Timber Development, Inc. v. Wunnicke* (1984) 467 U.S. 82, 93 [81 L.Ed.2d 71, 104 S.Ct. 2237] ["Our cases make clear that if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities."].)

The distinction was first discussed in *Hughes v. Alexandria Scrap Corp.* (1976) 426 U.S. 794 [49 L.Ed.2d 220, 96 S.Ct. 2488], where the State of Maryland sought to diminish the number of abandoned automobiles by instituting a program that paid a "bounty" to scrap metal processors for destroying vehicles. Out-of-state processors could participate, but, after an amendment to the statute governing the program, the documentation requirements were more strict for those operating outside of Maryland. The Supreme Court held that the statute did not violate the commerce clause despite its disparate impact on out-of-state processors. The court contrasted the Maryland bounty program to situations in which a state improperly "interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation." (*Id.* at p. 806.) Maryland, in contrast, "has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price." (*Ibid.*) The court rejected the notion that "the entry by the State itself into the market as a purchaser, in effect, of a potential article of interstate commerce creates a burden upon that commerce if the State restricts its trade to its own citizens or businesses within the State." (*Id.* at p. 808.)

---

[3] "The Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, empowers Congress to 'regulate Commerce with foreign Nations, and among the several States.' The Supreme Court has interpreted the clause not only to grant legislative power to Congress, but also impliedly to limit the power of State and local governments to enact laws affecting foreign and interstate commerce. [Citation.] The implied limitation on State and local powers is referred to as the dormant Commerce Clause." (*Air Transport, supra,* 992 F.Supp. at p. 1161.)

*Hughes* was followed and expanded in *Reeves, Inc. v. Stake* (1980) 447 U.S. 429 [65 L.Ed.2d 244, 100 S.Ct. 2271] where a state-owned cement plant favored in-state purchasers when output was insufficient to supply its product to all who desired to purchase it; *White v. Massachusetts Council of Construction Employers, Inc.* (1983) 460 U.S. 204 [75 L.Ed.2d 1, 103 S.Ct. 1042], where a city required those who entered into construction contracts paid for in whole or in part by city funds to hire city residents; and *Building and Construction Trades Council v. Associated Builders and Contractors* (1993) 507 U.S. 218 [122 L.Ed.2d 565, 113 S.Ct. 1190], where a local entity required bidders on a construction project to agree to abide by a union labor agreement. In *Reeves*, the court explained that states acting as market participants should be treated the same as private entities. (447 U.S. at pp. 436–437.) Since state proprietary activities were generally burdened with the same restrictions imposed on private market participants, "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." (*Id.* at p. 439; accord, *White v. Massachusetts Council of Construction Employers, Inc., supra,* at pp. 214–215 ["Insofar as the city expended only its own funds in entering into construction contracts for public projects, it was a market participant and entitled to be treated as such under the rule of *Hughes v. Alexandria Scrap Corp*[, *supra,*] 426 U.S. 794 . . . ."]; *Building and Construction Trades Council v. Associated Builders and Contractors, supra,* at pp. 231–232 ["To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."].)

In two other cases, however, the Supreme Court found that states went too far, and their apparent exercise of proprietary power was deemed a covert regulation. In *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.* (1986) 475 U.S. 282 [89 L.Ed.2d 223, 106 S.Ct. 1057], the court examined a Wisconsin statute that debarred repeat violators of the National Labor Relations Act (NLRA) from doing business with the state for a period of several years. The issue was whether the statute was preempted by the NLRA. The court held that "by flatly prohibiting state purchases from repeat labor law violators Wisconsin 'simply is not functioning as private purchaser of services,' [citation]; for all practical purposes,

Wisconsin's debarment scheme is tantamount to regulation." (*Id.* at p. 289.) Mindful of the holdings in *Hughes* and its progeny that "state action in the nature of 'market participation' is not subject to the restrictions placed on state regulatory power by the Commerce Clause" and recognizing that "[n]othing in the NLRA . . . prevents private purchasers from boycotting labor law violators," the court expressed the belief that state action was subject to greater restriction where Congress had acted: "What the Commerce Clause would permit States to do in the absence of the NLRA is thus an entirely different question from what States may do with the Act in place." (*Id.* at pp. 289–290.)

The court invalidated a state statute of a similar type in *South-Central Timber Development, Inc. v. Wunnicke, supra*, 467 U.S. 82, where the issue was the validity of Alaskan legislation requiring timber taken from state lands to be processed within the state. With one justice not participating in the decision, a four-justice plurality reached the following conclusion: "The market-participant doctrine permits a State to influence 'a discrete, identifiable class of economic activity in which [it] is a major participant.' [Citation.] Contrary to the State's contention, the doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the state imposes it upon someone with whom it is in contractual privity. . . . [¶] The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. Unless the 'market' is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry." (*Id.* at pp. 97–98, fn. omitted.)

Relying on *Wunnicke*, the federal district court in *Air Transport, supra*, 992 F.Supp. 1149, struck down the San Francisco anti-domestic-partner discrimination ordinance under the dormant commerce clause—despite having concluded that article 11, section 7 did not invalidate the provision, as we previously discussed. Since there was "no question that the City is acting as a market participant when it implements the Ordinance" or that "when the City enters into contracts that are subject to the Ordinance, it is directly participating in the marketplace by purchasing services or leasing property," the question the district court addressed was "whether, by implementing the Ordinance, the City inappropriately reaches beyond the sphere of economic activity in which it is participating in an attempt to regulate commerce beyond its borders." (*Air Transport*, at p. 1163.) Answering the question, the court concluded that "the Ordinance reaches too far to be shielded by the market

participant exception. Contractors must guarantee that, throughout the term of the contract, they will not provide discriminatory employee benefit packages in 'any of [their] operations elsewhere within the United States.' S.F. Admin. Code § 12B.1(d)(iv). Technically, subsection (iv) does not 'reach beyond the immediate parties with which the government transacts business,' [citation], because only companies that sign contracts with the City are affected. However, this class of economic activity encompasses much more than that in which the City is a 'major participant,' *id.*, and the individuals affected by the Ordinance could hardly be described, even informally, as 'working for the city.' *Id.* Under the plurality's test in *Wunnicke*, section 12B.1(d)(iv) of the Ordinance surely fails as applied to out-of-State conduct. This section applies to contractor conduct that is not related to the purpose of the contract. Cf. § 12B.1(d)(iii) (contract-related conduct carried out anywhere in the United States). By operation of this subsection, a contractor may face penalties, termination of the contract, a two-year bar from contracting with the City, and forfeiture of moneys owed by the City under the contract. These consequences are certainly substantial enough to create a regulatory effect on the contractors' out-of-State activities. The Ordinance, therefore, has 'a substantial regulatory effect outside of [the] particular market' in which the City participates." (992 F.Supp. at p. 1163.)

■ As we have discussed, Burns does not contend that Chapter 2.203 is invalidated by the commerce clause, but suggests, instead, that the *Air Transport* court's treatment of extraterritoriality under the dormant commerce clause should guide our interpretation of extraterritoriality under article 11, section 7. There are similarities between article 1, section 7 and the dormant commerce clause: both are interpreted to preclude extraterritorial regulation by governmental entities but permit incidental impact that results from an entity's legitimate exercise of its contracting authority. This does not mean, however, that the two provisions must be interpreted identically in all circumstances. The district court in *Air Transport* drew a distinction between the dormant commerce clause and article 11, section 7, finding that the ordinance precluding the City and County of San Francisco from contracting with companies that did not provide benefits to domestic partners was invalid under the former, but not the latter.

■ The *Air Transport* court's conclusion that local ordinances should be subject to a more rigorous review for extraterritorial impact under the dormant commerce clause than under article 11, section 7 is not unreasonable. State governments are independent governmental units, not subject to control by other states, and Congress's power over the states is limited. Local

governmental entities, on the other hand, are subject to the authority of the state. If a local government's contracting actions place undue burdens on intrastate commerce, the Legislature can more easily take corrective measures.[4] Consequently, there is no need for article 11, section 7 to be applied as stringently by California courts to protect cities or counties from overreaching by their neighbors.

More importantly, we do not agree that application of the federal authorities' reasoning would invalidate Chapter 2.203. In the two Supreme Court decisions most analogous to our case—*Building and Construction Trades Council v. Associated Builders and Contractors, supra,* 507 U.S. 218, where contractors were required to agree to abide by a union labor agreement, and *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc., supra,* 475 U.S. 282, where Wisconsin refused to do business with repeat violators of the NLRA—the legislation was either upheld or deemed preempted by a conflicting federal statute. In neither case was the dormant commerce clause's prohibition on extraterritorial regulation applied to invalidate the challenged provisions.

■ At the same time, the situation of the City and County of San Francisco in *Air Transport* is markedly different from that of the County here. San Francisco could point to no proprietary interest that was being served by its ordinance requiring contractors to provide domestic partner benefits. Here, in contrast, the County has put forward two bases for the jury service contractual requirement that inure to its direct benefit. First, the court system requires a steady supply of jurors to remain functional. Second, the County itself provides jury service benefits to its employees whether they reside inside or outside of the County. Employers who do not provide similar benefits add to the County's financial burden as the County is forced to suffer the cost of sending a disproportionate number of its own employees to sit through lengthy trials—including trials that take place in neighboring counties. To the

---

[4] The differences between the Legislature's power under the California Constitution and Congress's power under the United States Constitution were discussed in *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284 [132 Cal.Rptr.2d 713, 66 P.3d 718], where the court said: " 'Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, "we do not look to the Constitution to determine whether the [L]egislature is authorized to do an act, but only to see if it is prohibited." [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' "

extent it is advancing its own financial interests or serving its own needs as opposed to those of society as a whole through Chapter 2.203, the County is acting as a market participant, not a regulator. The County's expressed interest in increasing the number of jurors available to serve in its courts and in decreasing the reliance on County employees who are paid for unlimited service provide an obvious proprietary interest not present in *Air Transport.* Because of that distinction, we see no reason to abandon the straightforward approach of *Alioto's* in favor of the more involved federal approach. We conclude that article 11, section 7 does not interfere with the County's ability as a market participant to insist that those who seek its custom not obtain a free ride at its expense.

## II

### Preemption

Burns contends that Chapter 2.203 is preempted by state law. Specifically, Burns points to Government Code sections 12945.2 and 19702.3 relating to family leave; Government Code section 19871 and Education Code section 89529.03 relating to disability leave; Labor Code sections 4804.1, 4806, and 4850 relating to workers' compensation leave; Labor Code section 1043 relating to literacy leave; Labor Code sections 230.7 and 230.8 relating to leave for participation in school activities; Labor Code sections 1025 and 1027 relating to leave for alcohol and drug rehabilitation; Labor Code section 230.3 relating to leave for volunteer civil service; Elections Code section 14000 and 12312 relating to leave for voting; and Labor Code section 230.1 relating to leave for victims of domestic violence; as well as Labor Code section 230, Government Code section 1230, and Education Code sections 44036, 44037, 87035, and 87036, all relating to jury duty leave.

The County maintains that because the ordinance represents an exercise of its contracting power rather than its regulatory power, the doctrine of preemption does not apply. Addressing that contention first, the decision in *Alioto's* appears to support the County's position. As we have seen, the ordinance there required that the city's nondiscrimination ordinance be incorporated into all leases involving city land. A then existing Labor Code provision stated: " '[I]t is the intention of the legislature to occupy the field of regulation of discrimination in employment encompassed by the provisions of this part, exclusive of all other laws banning discrimination in employment by any city, city and county, county or other political subdivision of the state . . . .' " (Quoted in *Alioto's, supra,* 120 Cal.App.3d at p. 604 [174 Cal.Rptr. 763].) Nevertheless, the court concluded that "the Legislature did not intend to preclude municipalities from including nondiscrimination provisions in their leases." (*Ibid.*)

The principle that an action undertaken pursuant to a local entity's contracting powers is not subject to preemption even if it has impact in an area where the Legislature intended to occupy the field has been called into doubt by recent federal court decisions. As we have discussed, in *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc., supra,* 475 U.S. 282, a Wisconsin statute debarring repeat violators of the NLRA was held to be preempted by the NLRA. Additionally, in *Air Transport, supra,* 992 F.Supp. 1149, the district court held that the San Francisco ordinance requiring contractors to provide domestic partner benefits, even if applied solely to employees residing within the state, was preempted by ERISA.

But assuming arguendo that the principle of preemption potentially applies where the challenged action arises from the local entity's contracting power, Chapter 2.203 would not be preempted. The general principles governing preemption were summarized in *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893 [16 Cal.Rptr.2d 215, 844 P.2d 534] as follows: " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.] [¶] 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.] [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.] [¶] Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.] [¶] Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (*Id.* at pp. 897–898.)

On the other hand, "where the state's preemption of the field or subject is not complete, local supplemental legislation is not deemed conflicting to the extent that it covers phases of the subject which have not been covered by state law." (*Alioto's, supra,* 120 Cal.App.3d at p. 604.)

Burns does not suggest that Chapter 2.203 duplicates or contradicts state law. Nor does it point to any express legislative pronouncement indicating that the Legislature intended to occupy the field of either employee leave in

general or jury leave in particular. Burns's entire argument boils down to this: "The State of California has fully occupied the field of law pertaining to employers' duties to provide leaves of absence" by "promulgating numerous laws regarding this field."

Similar arguments were made in *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853 [118 Cal.Rptr.2d 746, 44 P.3d 120], and *Galvan v. Superior Court* (1969) 70 Cal.2d 851 [76 Cal.Rptr. 642, 452 P.2d 930], where local gun control regulations were under attack. In particular, one plaintiff contended that "the large number of statutes dealing with guns and other weapons show that the Legislature has preempted the entire broad field of gun control or weapons control and that gun registration as a subject included within the broad field of gun or weapons control must be deemed preempted." (*Galvan, supra,* 70 Cal.2d at p. 860.) The court in *Galvan* responded: "The fact that there are numerous statutes dealing with guns or other weapons does not by itself show that the subject of gun or weapons control has been completely covered so as to make the matter one of exclusive state concern. [Fn. omitted.] [¶] To approach the issue of preemption as a quantitative problem provides no guidance in determining whether the Legislature intends that local units shall not legislate concerning a particular subject, and further confounds a meaningful solution to preemption problems by offering a superficially attractive rule of preemption that requires only a statutory nosecount." (*Id.* at p. 861.)

■ The same is true here. The fact that a host of narrowly drawn statutes can be found in the various codes forbidding employers from discharging employees who serve on juries (see Lab. Code, § 230) or take certain other types of leave (see Elec. Code, §§ 12312, 14000; Gov. Code, §§ 12945.2, 19702.3; Lab. Code, §§ 230.1, 230.3, 230.4, 230.7, 230.8, 1025), and authorizing various agencies to pay their employees for jury leave (see Gov. Code, § 1230; Ed. Code, §§ 44036–44037, 87035–87036) or other types of leave (see Gov. Code § 19871; Lab. Code, §§ 4804.1, 4806, 4850; Ed. Code, § 89529.03), does not mean that the Legislature intends to occupy the field of "employee leave." The ordinance is not preempted by state law.

## DISPOSITION

The judgment is affirmed.

Epstein, P. J., and Hastings, J., concurred.