[No. D056530. Fourth Dist., Div. One. May 18, 2011.]

ASSOCIATED GENERAL CONTRACTORS OF AMERICA, SAN DIEGO CHAPTER, INC., Plaintiff and Appellant, v.
SAN DIEGO UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

750

**COUNSEL**

Marks, Golia & Finch, Chad T. Wishchuk, Stephen J. Schultz and Mark T. Bennett for Plaintiff and Appellant.

Tosdal, Smith, Steiner & Wax, Thomas Tosdal, Fern M. Steiner and Jon Y. Vanderpool for Defendant and Respondent.

## OPINION

**BENKE, Acting P. J.**—By way of Labor Code[1] section 3070 et seq., the Legislature has established a nonmandatory system of evaluating and approving building trades apprenticeship-training programs. Under that system, the Department of Industrial Relations (the department) has the responsibility for setting minimum apprenticeship training standards and approving individual apprenticeship programs. When a program has been approved by the department, contractors on public works projects may pay trainees in the approved program apprenticeship wages and the programs themselves are entitled to educational subsidies.

In San Diego an apprenticeship program sponsored jointly by trade unions and contractors with whom the unions have collective bargaining agreements trains a substantial number of apprentices. In addition to the joint labor-management apprenticeship program, petitioner Associated General Contractors of America, San Diego Chapter, Inc. (AGC), sponsors a separate apprenticeship program which does not involve the participation of building trades unions or contractors who have collective bargaining agreements with the unions. Both apprenticeship programs have been approved by the department.

By way of an agreement with local building trades unions, the board of education of the San Diego Unified School District (SDUSD or district) adopted a policy which requires that bidders on certain of its construction projects employ apprentices trained in the joint labor-management apprenticeship program. AGC filed a petition for a writ of mandate challenging the agreement and policy. AGC alleged the agreement and policy unlawfully intruded on the department's regulatory power over apprenticeship programs and violated provisions of California's prevailing wage law (PWL), section 1720 et seq. The trial court denied AGC's petition. On appeal from the order denying the petition, we affirm.

■ Our review of the statutes governing apprenticeship programs discloses the regulatory scheme adopted by the Legislature was intended to establish minimum educational and training standards for apprenticeship programs. Importantly, the statutes expressly permit approved apprenticeship programs to provide education and training which exceed the minimum standards required by the department. Because the governing statutes expressly contemplate differences among apprenticeship programs, we reject AGC's contention that the district invaded the department's regulatory power

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

by making an agreement which favors one qualified program over another. Moreover, nothing in the PWL expressly or implicitly prevents public agencies from requiring that apprentices employed on agency construction projects participate in a particular training program.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 4, 2008, voters within SDUSD approved Proposition S, a $2.1 billion bond issue which provided funding for a program of repair and renovation of the district's facilities. On January 13, 2009, the district's board of education adopted a resolution which directed the district's staff to negotiate a project stabilization agreement (PSA) with local building trades unions. The PSA would govern Proposition S projects and, among other matters, require participation by bidders and their employees in joint labor-management apprenticeship programs approved by the department.

Thereafter the board of education and the local building trades unions entered into a PSA. Under the terms of the PSA, all contractors on Proposition S projects must recognize the building trades unions as the exclusive bargaining representatives of covered employees working on Proposition S projects and must not engage in any lockout. For their part, the unions agreed not to engage in any strike, slowdown, interruption or disruption of any Proposition S project. Of concern here, the PSA also requires that any apprentices used by contractors on Proposition S projects be enrolled in a state-approved joint labor-management apprenticeship program.[2] At the hearing at which the PSA was adopted, one member of the board stated: "I think the question, you know, that I continue to have after visiting [the nonunion apprenticeship programs] is, what's the commitment on the part of the non-union contractors to the people who are being trained through the apprenticeship programs. And I got to say that that question persists in my mind certainly. 90 percent of the graduates of apprenticeship programs in San Diego County are coming out of the union programs. Nearly a hundred percent of women and people of color who graduate from apprenticeship programs are coming out of the union apprenticeship program. The non-union contractors frequently state the claim that 85 percent of the industry in San Diego County is non-union. So whether that's true or not, if 15 percent of the industry is producing 90 to a hundred percent of the graduates, that's real commitment. And I've heard suggestions from the non-union contractors that

---

[2] The PSA in pertinent part states: "The term 'Apprenticeship Program' as used in this Agreement shall be defined as a joint labor management apprenticeship program certified by the State of California . . . ." The PSA further provides: "Apprentices, if utilized, must be enrolled in a California Apprenticeship Council approved apprenticeship program."

as a result of this project stabilization agreement, they might close down their apprenticeship programs. And, what I would say is, again, I would ask for a commitment from those contractors that if they actually believe in their programs and they control 85 percent of the local industry, which they claim to control, maintain your commitment to your programs, but improve your graduation rates, improve your—your outreach to communities of color and to women. Bring yourself—do the work over time that the labor management apprenticeship programs have committed to, and then we will—you know, we'll see where we are in a few years. But if you've got real commitment to the apprentices, continue that commitment and we'll see where we get in a few years."

The board member further stated: "[W]e have an opportunity to partner with the best apprenticeship programs in this state to create real career opportunities for the kids who are coming out of our schools."

In response to the board of education's adoption of the PSA, AGC filed in the trial court a petition for a writ of mandate. AGC's petition alleged that in requiring that bidders on Proposition S projects use joint labor-management apprenticeship programs, the board of education violated provisions of the Labor Code regulating apprenticeship programs and separate provisions of the PWL. The trial court denied the petition.

On appeal from the order denying its petition, AGC once again contends the board of education's January 2009 resolution and later PSA violate various provisions of the Labor Code.

I

"Review of 'a local entity's legislative determination is through ordinary mandamus under [Code of Civil Procedure] section 1085. "Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support. [Citation.]" . . . "With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal." ' [Citation.]

"Further, where the pertinent facts are undisputed and the issue is one of statutory interpretation, the question is one of law and we engage in a de novo review of the trial court's determination." (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1253 [15 Cal.Rptr.3d 344].)

II

As SDUSD points out, agreements such as the PSA have been repeatedly approved by state and federal courts when challenged on a variety of

grounds. In rejecting a claim that a PSA which covered expansion and renovation of the San Francisco International Airport violated state and local competitive bidding laws, the court in *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352 [87 Cal.Rptr.2d 654, 981 P.2d 499] (*Associated Builders*) briefly reviewed the operation of PSA's and the rationale of the federal law which authorizes them: "The PSA involved in the present case exacts from the signatory unions over the expected 10-year life of the project a no-strike pledge, an agreement to arbitrate jurisdictional disputes among crafts, and a promise to continue work on the project despite the expiration of any applicable collective bargaining agreements. In exchange, the Commission agrees to require all contractors to accept the terms of the PSA, to abide by each craft's labor-management grievance procedure in cases of discipline or discharge, and to use the union hiring hall for any new hires needed beyond the employer's own core workforce. Employers are also required to pay union wages and benefits.

"The PSA is an example of a type of prehire agreement designed for large and complex construction projects. It is designed to eliminate potential delays resulting from labor strife, to ensure a steady supply of skilled labor on the project, and to provide a contractually binding means of resolving worker grievances. Such agreements, also called project labor agreements, have long been used in large construction projects undertaken by both private concerns and, especially following the decision of the United States Supreme Court in *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.* (1993) 507 U.S. 218 [122 L.Ed.2d 565, 113 S.Ct. 1190] (*Boston Harbor*), public agencies. *Boston Harbor* held that the National Labor Relations Act (29 U.S.C. § 151 et seq.) (NLRA) does not preempt a public agency, acting as the owner of a construction project, from mandating an otherwise lawful project labor agreement as a bid specification for the project. (*Boston Harbor, supra*, at pp. 231–232 . . . .)

"In order to protect the right of workers freely to choose their bargaining representatives, the NLRA generally prohibits prehire agreements. By enacting what is often called the construction industry proviso in 1959 (see 29 U.S.C. § 158(f)), however, Congress recognized that special conditions prevailing in the construction industry warrant an exception to the general rule. Because of the typically short-term and occasional nature of employment with any given employer in the construction industry, Congress determined that '[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status . . . .' (Sen.Rep. No. 187, 86th Cong., 1st Sess., p. 55 (1959), reprinted at 1 Nat. Lab. Relations Bd., Legislative History of the Labor-Management Reporting and Disclosure Act of

1959 (1985) pp. 451–452 (1 Legislative History); see *NLRB* v. *Iron Workers* (1978) 434 U.S. 335, 348–349 [54 L.Ed.2d 586, 98 S.Ct. 651].) That is, a construction project might be completed and the workers dispersed to other jobs before a union could achieve certification through the often lengthy election process. Strikes, as an alternative to the election process, carried their own potentially extreme costs for both workers and employers. The construction industry developed its own solution to this problem, in the form of prehire agreements. As described in the Senate Report discussing the 1959 amendments to the NLRA: 'In the building and construction industry it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated. . . . One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral. A substantial majority of the skilled employees in this industry constitute a pool of such help centered about their appropriate craft union. If the employer relies upon this pool of skilled craftsmen, members of the union, there is no doubt under these circumstances that the union will in fact represent a majority of the employees eventually hired.' (Sen.Rep. No. 187, 86th Cong., 1st Sess., *supra*, p. 28, reprinted at 1 Legislative History, *supra*, at p. 424.) The construction industry provision of the NLRA (29 U.S.C. § 158(f)) removed any question regarding the legality, under federal labor law, of the standard prehire agreement . . . ." (*Associated Builders, supra*, 21 Cal.4th at pp. 358–360, fn. omitted.) However, the court in *Associated Builders* recognized that while *Boston Harbor* removed any question that PSA's are permissible under the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.), "it did not resolve other constitutional and state law issues such as those involved in the present case." (*Associated Builders*, at p. 360.)

Turning to the petitioners' contention the PSA violated state and local competitive bidding laws, our high court stated: "Here, all prospective bidders must agree to be bound by the terms of the PSA, and the prevailing wage law further serves to place bidders on a similar footing. Thus, all prospective bidders enjoy equal opportunity, within the meaning of the competitive bidding law, to compete for contracts on the project. That some [nonunion contractors] may be disinclined to accept the terms of the PSA does not imply any favoritism on the Commission's part toward those bidders that do not share that disinclination." (*Associated Builders, supra*, 21 Cal.4th at p. 367.) Thus the court held the PSA did not offend the competitive bidding laws relied upon by the petitioners. (*Id.* at p. 369.)

■ As its discussion of prehire agreements indicates, the holding in *Associated Builders* is in significant measure based on the earlier approval of prehire agreements by the United States Supreme Court in *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.* (1993) 507 U.S. 218 [122 L.Ed.2d 565, 113 S.Ct. 1190] (*Boston Harbor*). In finding a prehire agreement used for construction of sewage facilities and other infrastructure needed to clean up Boston Harbor was permissible under the NLRA (29 U.S.C. § 151 et seq.), the United States Supreme Court recognized the principle that when government agencies are acting in their capacity as the owners of property or purchasers of goods and services, they are not making policy or acting as regulators and largely have the same freedom to protect their interests as do private individuals and entities: "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction. [Citation.] Indeed, there is some force to petitioners' argument . . . that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces . . . ." (*Boston Harbor, supra,* 507 U.S. at pp. 231–232, fn. omitted.)[3]

---

[3] Federal courts have applied the market participant doctrine in a variety of other contexts to permit government agencies to discriminate in favor of particular suppliers of goods and services: "The market participant doctrine distinguishes between a state's role as a regulator, on the one hand, and its role as a market participant, on the other. Actions taken by a state or its subdivision as a market participant are generally protected from federal preemption. The doctrine was originally developed in a series of dormant Commerce Clause cases. In *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 [49 L.Ed.2d 220, 96 S.Ct. 2488] (1976), the Supreme Court held that Maryland did not violate the Commerce Clause by favoring in-state processors of scrap metal when participating in the market for scrap metal. *Id.* at 809–10 . . . . Subsequently, in *Reeves, Inc. v. Stake*, 447 U.S. 429 [65 L.Ed.2d 244, 100 S.Ct. 2271] (1980), the Court held that South Dakota, as a seller of cement, was free to discriminate in a time of shortage by selling cement only to in-state users. The Court was moved by 'considerations of state sovereignty, the role of each State as guardian and trustee for its people, and the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' *Id.* at 438–39 . . . (footnotes, citations, and internal quotation marks omitted). 'Even-handedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause.' *Id.* at 439 . . . . The Court stated that in market participant cases, courts undertake 'a single inquiry: whether the

■ In California the market participant doctrine has been applied to permit municipalities to impose, by way of contracting conditions, obligations which exceed those otherwise imposed under our state laws. In *Burns Internat. Security Services Corp. v. County of Los Angeles* (2004) 123 Cal.App.4th 162, 168–169 [19 Cal.Rptr.3d 776] (*Burns*), the County of Los Angeles adopted an ordinance which required that county contractors provide their employees with five days of paid jury service each year. County contractors argued the county's ordinance had an improper extraterritorial impact and thus violated the provisions of article 11, section 7 of the California Constitution and was preempted by various provisions of state law relating to jury duty leave. In rejecting these contentions, the court in *Burns* adopted a market participant approach to the contractors' claims. In particular, the court relied on the opinion in *Alioto's Fish Co. v. Human Rights Com. of San Francisco* (1981) 120 Cal.App.3d 594, 605 [174 Cal.Rptr. 763] (*Alioto's*), where the court held that the City and County of San Francisco could impose on contractors antidiscrimination and affirmative action obligations which exceeded the requirements of the state's antidiscrimination statute. (*Burns, supra,* 123 Cal.App.4th at p. 169.)

*Alioto's* in turn had relied on an earlier Attorney General opinion finding that a similar condition imposed by a school district was proper because the municipality was acting only in its role as a contractor: "In explaining the basis for his decision that the Berkeley Board of Education might properly include clauses prohibiting discrimination in employment in its construction contracts, the Attorney General observed that such clauses 'would be intended and designed to protect the school district from entering into a contract for or expending funds on a project executed in a manner contrary to the laws of the state. Such clauses constitute examples of the exercise by the local entity of its contracting power, a determination of the nature of the

---

challenged program constituted direct state participation in the market.' *Id.* at 435 n. 7 . . . (internal quotation marks omitted); *accord White v. Mass. Council of Constr. Employers, Inc.,* 460 U.S. 204, 208 [75 L.Ed.2d 1, 103 S.Ct. 1042] (1983) (citing *Reeves'* 'single inquiry' in upholding executive order requiring all Boston construction projects funded by city funds to be performed by work forces of at least half city residents).

"After the development of the market participant doctrine in these dormant Commerce Clause cases, the Supreme Court and the lower federal courts have applied the doctrine to protect proprietary state action from preemption by various federal statutes. *See, e.g., Building & Constr. Trades Council v. Associated Builders & Contractors ('Boston Harbor'),* 507 U.S. 218, 226–27 [122 L.Ed.2d 565, 113 S.Ct. 1190] (1993) (National Labor Relations Act); *Tocher [v. City of Santa Ana* (2000)] 219 F.3d [1040,] 1048–50 (Federal Aviation Administration Authorization Act of 1995 ('FAAA')); *Associated Gen. Contractors v. Metro. Water Dist.,* 159 F.3d 1178, 1183 (9th Cir.1998) (Employee Retirement Income Security Act of 1974)." (*Engine Manufacturers Assn. v. South Coast Air Quality Maintenance Dist.* (9th Cir. 2007) 498 F.3d 1031, 1040.)

contractual obligations it may desire to enter into and a requirement which provides a remedy not for the injured employee, but, instead, a remedy to the public agency for the special injury it suffers.' " (*Alioto's, supra,* 120 Cal.App.3d at p. 605, quoting 44 Ops.Cal.Atty.Gen. 65, 67 (1964).)

### III

As we have indicated, here AGC argues that notwithstanding the validity of PSA's in general, SDUSD's PSA violates both the legislative scheme by which apprenticeship programs are recognized by the state and the closely related provisions of the PWL which govern the use of apprentices on public works projects. As we explain, we find no conflict between the district's PSA and any requirement of either of the related statutory schemes AGC relies upon.

■ At the outset we must recognize the close connection between the state's approval of apprenticeship programs and application of the PWL. "While neither federal nor state approval is *required* for a sponsor to operate an apprenticeship program, strong financial incentives exist at both the state and federal levels for sponsors to obtain approval. For example, only apprentices participating in an approved apprenticeship program may be paid wages lower than the applicable journeyman wage on federal and state public works projects. (29 C.F.R. § 29.2(k) (1992); Lab. Code, § 1777.5.) As the Ninth Circuit has observed: 'In order for such an apprenticeship program to work, it is essential that the employer be able to pay lesser wages to the apprentices while they are in training.' (*Electrical Joint Apprenticeship Com.* v. *MacDonald* (9th Cir. 1991) 949 F.2d 270, 274 [hereafter *MacDonald*], cert. [den. *sub nom. MacDonald v. Associated Builders & Contractors* (1992) 505 U.S. 1204 [120 L.Ed.2d 869, 112 S.Ct. 2991]].) In California, additional financial incentives exist in· the form of direct financial subsidies for training provided by approved programs (Lab. Code, §§ 3074, 3074.7; Ed. Code, § 8152.)" (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 428–429 [14 Cal.Rptr.2d 491, 841 P.2d 1011]; see also Sen. Conc. Res. No. 49, Stats. 2003 (2003–2004 Reg. Sess.) res. ch. 135, pp. 6833–6834: ["The state's system for promoting quality apprenticeship training in the construction trades depends upon the incentives provided by the prevailing wage law."].) Thus, in evaluating the legality of the district's PSA, we must look to the entirety of the legislative scheme which both sets apprenticeship standards and encourages sponsorship of approved apprenticeship programs by way of substantial financial incentives.

### A. *Shelley-Maloney Act*

■ "In California, apprenticeship training is governed by the Shelley-Maloney Apprenticeship Labor Standards Act of 1939 (hereafter Shelley-Maloney Act), which is codified as California Labor Code section 3070 et seq. Pursuant to the Shelley-Maloney Act, apprenticeship training is administered by the Division, which is under the auspices of the Department of Industrial Relations (hereafter Department). (Lab. Code, § 3073.) The Chief of the Division, pursuant to Labor Code section 3073, administers the apprenticeship law, acts as secretary of the Council, and is empowered to investigate and either approve or disapprove written standards for apprenticeship programs. (Lab. Code, §§ 3073, 3075, 3090; Cal. Code Regs., tit. 8, §§ 212, 212.1, and 212.2.)

"The Council is established within the Division pursuant to Labor Code section 3070. The Council meets at the direction of the Director of the Department (hereafter Director) and aids the Director in formulating policies for the effective administration of the apprenticeship laws. (Lab. Code, § 3071.) The Council meets at least quarterly and is empowered to issue rules and regulations which establish apprenticeship standards, equal opportunity and affirmative action requirements for apprenticeship programs, and criteria for selection procedures for apprentices. (*Ibid.*)

"The approval process for apprenticeship programs begins when the program sponsor . . . submits written program standards to the Chief of the Division for approval. (Cal. Code Regs., tit. 8, § 212.) A detailed list of subjects and specifications that must be met in a program's standards in order for the program to be approved is set forth at title 8, California Code of Regulations, section 212." (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council, supra,* 4 Cal.4th at pp. 433–434, fns. omitted.)

However, notwithstanding the power of the department to set apprenticeship training standards and approve particular apprenticeship programs, section 3086 expressly permits employers and unions, by way of collective bargaining agreements, to set higher apprenticeship standards: "Nothing in this chapter or in any apprentice agreement approved under this chapter shall operate to invalidate any apprenticeship provision in any collective agreement between employers and employees setting up higher apprenticeship standards."

### B. *PWL Apprenticeship Provisions*

■ The PWL was enacted in 1937 (Stats. 1937, ch. 90, p. 243) and in general requires that contractors on public works projects pay their employees

union wages. (§ 1773; see also *Associated Builders, supra*, 21 Cal.4th at p. 359, fn. 1.) "The overall purpose of the prevailing wage law . . . is to benefit and protect employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)

■ Of import here, in 1937 the Legislature added to the PWL a provision, section 1777.5, which permitted public contractors to pay apprentice wages to workers with whom they had entered apprenticeship agreements under the then current version of section 3077. (Stats. 1937, ch. 872, p. 2424.) Later, in 1939, the PWL was amended to permit public contractors to pay apprentice wages to workers who participated in programs approved under the provisions of the Shelley-Maloney Apprentice Labor Standards Act of 1939 (Shelley-Maloney Act; § 3070 et seq.). (§ 1777.5, subd. (c); Stats. 1939, ch. 220, § 2, p. 1472; Stats. 1939, ch. 971, § 1, p. 2723.) By its terms the PWL requires that contractors pay apprentices the prevailing apprentice wage, employ apprentices at a minimum ratio to journeymen and only employ apprentices from programs approved by the department. (§ 1777.5, subds. (b), (d) & (g).)

IV

■ Contrary to AGC's argument, nothing in the Shelley-Maloney Act itself either expressly or implicitly prevents a public agency from requiring that contractors on its public works projects use apprentices trained in a particular apprenticeship program. Indeed, we note that the standards and approvals established by the Shelley-Maloney Act are themselves entirely voluntary. (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council, supra*, 4 Cal.4th at pp. 428–429.) In addition, section 3086, by expressly allowing for the establishment of higher apprenticeship standards than otherwise required by the department, makes it clear that the Shelley-Maloney Act was not intended to operate as a comprehensive and exclusive means of regulating apprenticeship programs. Rather, given its voluntary nature and its express allowance for higher standards, it is clear the Shelley-Maloney Act was only intended to set minimum apprenticeship standards which individual programs are free to supplement. In that statutory

context, we cannot accept AGC's contention the Shelley-Maloney Act prevents either private entities or governmental agencies from specifying that workers on their projects be trained in a particular manner or in a particular program which otherwise meets the requirements of the statute. In specifying the type of training those working on its projects must have, a public agency, such as SDUSD, is plainly acting as a market participant and nothing on the face of the Shelley-Maloney Act suggests the Legislature intended to infringe on the district's power to use its contracting authority to advance what it believes is its legitimate proprietary interests. (See *Burns, supra,* 123 Cal.App.4th at p. 178.)

In contrast to the provisions of the Shelley-Maloney Act, the PWL was plainly designed to directly limit public agencies' role as market participants.[4] The PWL is an express and direct limitation on the power of state and local agencies as they act in the market for public works projects. Unlike private contractors, public agencies governed by the PWL are not free to protect their proprietary interests by permitting contractors to pay workers less than the prevailing union wage. Here in particular, the PWL directly controls not only how much apprentices must be paid, but how many apprentices a contractor must employ and how they are trained. (§ 1777.5, subds. (b), (d), (g).) These requirements apply to a public agency acting in its contracting role notwithstanding what might otherwise be in its proprietary interest. The question we face then is whether a public agency may impose on contractors apprenticeship conditions *in addition* to those which appear on the face of the PWL.

Relying on section 1777.5, subdivision (d), AGC contends that under the PWL contractors, rather than agencies, have the right to select any apprenticeship program approved by the department and that agencies acting in their capacities as the owners of public works projects cannot interfere with a contractor's apprenticeship choice. Section 1777.5, subdivision (d) can certainly be read as argued by AGC.[5] We decline to do so however. As we read that provision, although in general it gives contractors freedom in

---

[4] The parties agree the PWL applies to the district's construction projects.

[5] Section 1777.5, subdivision (d) states: "When the contractor to whom the contract is awarded by the state or any political subdivision, in performing any of the work under the contract, employs workers in any apprenticeable craft or trade, the contractor shall employ apprentices in at least the ratio set forth in this section and may apply to any apprenticeship program in the craft or trade that can provide apprentices to the site of the public work for a certificate approving the contractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected. However, the decision of the apprenticeship program to approve or deny a certificate shall be subject to review by the Administrator of Apprenticeship. The apprenticeship program or programs, upon approving the contractor, shall arrange for the dispatch of apprentices to the contractor. A contractor covered by an apprenticeship program's standards shall not be required to submit any additional application in order to include additional public works contracts under that program.

selecting "any" apprenticeship program, nothing on the face of the statute prevents a contractor from agreeing with a third party, such as a public agency or a union, to select a particular apprenticeship program approved by the department.

A number of considerations support our conclusion that the freedom provided by section 1777.5, subdivision (d) includes the freedom to agree with third parties that a particular apprenticeship program approved by the department will be used on a particular project. First, the PWL is not legislation designed to protect the interests of contractors. The cases have repeatedly found the PWL is designed to protect the interests of workers. (See *Lusardi Construction Co. v. Aubry, supra,* 1 Cal.4th at p. 987.) Thus an agreement that a contractor will use a particular approved apprenticeship program does not offend the overall goal of the PWL.

Second, we note that the apprenticeship provisions of the PWL are designed as an incentive to encourage contractors to participate in approved apprenticeship programs and that the Shelley-Maloney Act itself is a strictly voluntary scheme which expressly contemplates variations in the type of training offered by approved apprenticeship programs. Its use as an incentive for participation in approved apprenticeship programs does not suggest the PWL was meant as any limitation on the right of contractors and public agencies to select a particular approved apprenticeship program which meets their particular needs. Rather, the parties' selection, by agreement, of an approved program is fully consistent with the PWL's role as an incentive for participation in approved apprenticeship programs.

In sum, although the PWL does limit the power of public agencies acting as market participants, its limitations do not go so far as AGC suggests. Rather, the PWL permits public agencies to advance their proprietary interests, so long as they do so in a manner which is otherwise consistent with the statute. With respect to apprenticeship programs, the PWL only requires that apprenticeship programs be approved by the department. Here, the district's PSA requires use of an approved program and is therefore consistent with both the Shelley-Maloney Act and the PWL.[6]

---

'Apprenticeable craft or trade,' as used in this section, means a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by the California Apprenticeship Council. As used in this section, 'contractor' includes any subcontractor under a contractor who performs any public works not excluded by subdivision (o)."

[6] Because we have found that the PSA is valid, we have not reached SDUSD's alternative contention that AGC lacks standing to challenge the PSA.

The order is affirmed.

Huffman, J., and Aaron, J., concurred.

A petition for a rehearing was denied June 13, 2011, and appellant's petition for review by the Supreme Court was denied August 31, 2011, S194282.